UNITED STATES, Appellee

v.

Maung M. LWIN, Private First Class
U.S. Marine Corps, Appellant.

No. 94–0038.
CMR No. 91 1451.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 11, 1995.

Decided Aug. 23, 1995.

For Appellant: *Hillary Richard* (argued); *Major Steven Hammond,* USMC and *Lieutenant David P. Sheldon,* JAGC, USNR (on brief).

For Appellee: *Major Laura L. Scudder,* USMC (argued); *Commander S.A. Stallings,* JAGC, USN (on brief); *Colonel T.G. Hess,* USMC, *Colonel J. Composto,* USMC, *Lieutenant Commander Lyle H. Bowen, Jr.,* JAGC, USN, *Captain Laulie S. Powell,* USMC.

*Opinion of the Court*

WISS, Judge:

1. This is an appeal from a general court-martial conviction (military judge sitting alone) for absence without leave and missing movement, in violation of Articles 86 and 87, Uniform Code of Military Justice, 10 USC §§ 886 and 887, respectively.[1] In this Court, appellant urges that "the [trial] court's finding of personal jurisdiction over [him], a Marine corps reservist, despite valid Marine Corps regulations expressly excepting him from active duty, violates the Due Process Clause of the United States Constitution." Final Brief at 5. The fly in the ointment of

1. The military judge sentenced appellant to a bad-conduct discharge, confinement and forfeiture of $650.00 pay per month for 4 months, and reduction to the lowest enlisted grade. In a post-conviction petition in the Court of Military Review (*see* 41 MJ 213, 229 n. * (1994)) for a writ of habeas corpus, appellant unsuccessfully contested the jurisdiction of the court-martial. 33 MJ 666 (1991). Thereafter, the convening authority approved the trial results. In unpublished opinions, the Court of Military Review affirmed the findings and sentence on direct review, *see* Art. 66(b) and (c), Uniform Code of Military Justice, 10 USC § 866(b) and (c), and reaffirmed that decision on appellant's motion for reconsideration.

appellant's argument is his assumed predicate that "valid Marine Corps regulations expressly except[ed] him from active duty...." We do not agree with that predicate; accordingly, we find no merit in this appeal.

I

2. Appellant is a member of the Selected Marine Corps Reserves, whose unit was ordered to active duty as part of our armed forces' mobilization to Southwest Asia in connection with Operation Desert Shield. He was to report by 6:00 a.m. on November 24, 1990. He failed to report as ordered, however, and failed to move with his unit. *See* 33 MJ 666, 667–68 (1991).

3. At his resultant court-martial and throughout his appeal, appellant has maintained that his application for conscientious objector status—which he filed on November 9, 1990, prior to receiving his activation orders on November 18—estopped the Marine Corps, by virtue of their own regulation, from activating him until it had resolved his application. A reasoned analysis of appellant's argument requires that we start, as they say, at the beginning.

II

4. Article 2(a)(1), UCMJ, 10 USC § 802(a)(1), provides that persons are subject to the UCMJ who are *"lawfully called or ordered into,* or to duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it." (Emphasis added.) Our inquiry, then, is whether appellant was "lawfully called" to active duty.

5. The chain of events leading to appellant's orders began on August 22, 1990, when the President of the United States issued Executive Order No. 12727, entitled "Ordering the Selected Reserve of the Armed Forces to Active Duty." Therein, he expressed his "determin[ation] that it is necessary to augment the active armed forces of the United States for the effective conduct of

operational missions in and around the Arabian Peninsula." Also, he explicitly "authorize[d] the Secretary of Defense, and the Secretary of Transportation with respect to the Coast Guard ..., *to order to active duty* units and individual members not assigned to units, of the Selected Reserve."[2] 55 Fed. Reg. 35027, *reprinted in* 1990 U.S.Code Cong. & Admin. News B36 (emphasis added).

6. In promulgating this Executive Order, the President expressly acted pursuant to his authority under 10 USC § 673b. Within certain restrictions not relevant here, § 673b empowers the President to authorize the Secretaries of Defense and Transportation (for the Coast Guard) to order units of the Selected Reserve involuntarily to active duty "when the President determines that it is necessary to augment the active forces for any operational mission...." 10 USC § 673b(a). Further, the statute authorizes the Secretaries to "prescribe such polices and procedures for the armed forces under their respective jurisdictions as they consider necessary to carry out this section." 10 USC § 673b(e).

7. The next day, in a memorandum directed to the Secretaries of the Military Departments and to the Chairman of the Joint Chiefs of Staff, the Secretary of Defense delegated to the Service Secretaries "authority to order" units of the Selected Reserve "to active duty" within certain limitations. The Secretary concluded by instructing: "The Secretaries of the Military Departments *shall exercise* the authority granted by this memorandum in a manner *consistent with the attached guidance.*" (Emphasis added.) Paragraph c of the "GUIDANCE" provided:

*Effective immediately all screening activity of Selected Reservists to determine their availability for active service ceases. All members of the Selected Reserve shall be considered immediately available for active duty.* Selected Reservists ordered to active duty with their unit or as individuals shall report as ordered unless physi-

---

2. The mobilization of the Selected Reserve was extended by a similar Executive Order, numbered 12733, issued on November 13, 1990. *See*

55 Fed.Reg. 47837, *reprinted in* 1990 U.S.Code Cong. & Admin. News B46.

cally unable to do so.... After reporting as ordered, members may be considered for release on humanitarian or other grounds under criteria applicable to active force members generally.... *It is important for the integrity of the entire call-up activity that the criteria for assessing releases be uniform and strictly enforced.*

(Emphasis added.)

8. Nowhere in the memorandum or the guidance were conscientious objectors excepted from the blanket screening policy, which: 1) stopped preactivation screening effective that date, August 23, 1990; 2) required all members of activated units to report as ordered, with the only exception being physical inability; and 3) stipulated that individual grounds for release would be considered only after the particular individuals had reported. Indeed, the ultimate sentence in the paragraph quoted above explains the policy imperative that this screening process "be uniform and strictly enforced."

9. Notwithstanding, appellant contends that he was not required to report as ordered. For protection against the foregoing, he principally invokes the 4th Marine Division (REIN) Mobilization Management Plan (MOBPLAN) (dated October 1, 1985, and amended periodically since, including on November 18, 1990). Paragraph 8c, Appendix 8, Annex E of Volume I addresses treatment of conscientious objectors during a mobilization as follows:

> The processing of conscientious objectors is promulgated in MCO 1306.16 (Conscientious Objectors). Conscientious objectors do not fall under deferment or separation criteria, but should be screened[3] prior to mobilization. A Marine reservists [sic] ordered to active duty must obey his orders unless his request for recognition as a

conscientious objector was received prior to the mobilization order.

Appendix to Final Brief at 244. Paragraph 6k of Marine Corps Order [MCO] 1306.16E, referenced in the MOBPLAN, provides:

> "A Marine reservist who applies for conscientious objector status will not normally be ordered to involuntary active duty until the application is resolved. Proper resolution of the application is best accomplished within the Reserve unit."

*See* 33 MJ at 668.

10. His argument is not persuasive. First, the claimed absolutism of this alleged protection against activation of conscientious objectors, which is so crucial to appellant's tactic of using these provisions to rebuff the authoritativeness of the Secretary's memorandum, logically is compromised by the use in these provisions of such words as "should" and "normally." Such language is not the stuff from which impenetrable shields are made.

11. Second, and most critically, his argument is inimical to the bedrock principle of our democracy relating to civilian control over the military. A statute of Congress (10 USC § 673b(a)) empowered the President of the United States to authorize the Secretary of Defense "to order any unit ... of the Selected Reserve ... to active duty ...." under circumstances like those that existed at that time. In turn, pursuant to the President's exercise of this statutory power in Executive Order No. 12727, the Secretary of Defense published his memorandum of August 23, 1990, which concluded by directing Service Secretaries to exercise their delegated activation authority "in a manner consistent with the attached guidance." The Secretary of Defense was specifically empowered, not just by the Executive Order but by statute of Congress (10 USC § 673b(e)), to

---

3. Appellant contends that the Secretary of Defense's memorandum of August 23 "did not address the processing of conscientious objector applicants; rather, it addressed only 'screening activity' ... Screening is a term of art, which ... do[es] *not* include or in any fashion involve the processing of conscientious objector applications." Final Brief at 21 and Reply Brief at 8.

This argument is ironic—and would seem seriously to be undermined—in view of this use of "screened" in connection with processing conscientious objectors that is found in the very provision in the MOBPLAN upon which appellant so heavily relies as the authoritative source for whether he was liable to obey his activation order.

prescribe the policies and procedures under which the Selected Reserves would be mobilized. Finally, in turn, the Secretary's "attached guidance" unabashedly put an immediate halt to "all screening activity of Selected Reservists to determine their availability for active service" and, instead, directed that consideration of individual circumstances relating to service on active duty would be done only "[a]fter reporting as ordered."

12. To the extent that any regulations or plans of a military service might be read as inconsistent with this approach, they unequivocally must yield to the super-authority of these statutorily authorized actions of the President and the Secretary of Defense. Based on our analysis, appellant's application for conscientious-objector status was swept within the Secretary's policy directive. Accordingly, by virtue of Article 2(a)(1), he became subject to the Uniform Code of Military Justice and legally was obligated to obey his activation orders.

### III

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judges COX, CRAWFORD, and GIERKE concur.

SULLIVAN, Chief Judge (concurring):

13. I agree with the majority's resolution of this case. In my view, however, this appeal can be resolved on the alternative ground that "the mobilization order" referred to in paragraph 8c, Appendix 8, Annex E of Volume I of the 4th Marine Division (REIN) Mobilization Management Plan (MOBPLAN) (Oct. 1, 1985), *see* Appendix to Final Brief at 244, was the President's Executive Order No. 12727, entitled "Ordering the Selected Reserve of the Armed Forces to Active Duty," 55 Fed.Reg. 35027 (Aug. 22, 1990), *reprinted in* 1990 U.S.Code Cong. & Admin. News B36. *See generally* 10 USC § 673b (Responsibility of President).